The STATE of Ohio, Appellee,

v.

ADRIAN, Appellant.

[Cite as *State v. Adrian,* 168 Ohio App.3d 300, 2006-Ohio-4143.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2005 CA 23.

Decided Aug. 11, 2006.

302

Scott D. Schockling, for appellee.

Samuel H. Shamansky, for appellant.

WOLFF, Judge.

{¶ 1} Danny C. Adrian was convicted by a jury in the Champaign County Court of Common Pleas of one count of attempted rape, one count of attempted complicity to commit kidnapping, one count of compelling prostitution, and two counts of complicity to prostitution. He was acquitted of a second count of attempted rape. Adrian was sentenced to various concurrent sentences, resulting in ten years of imprisonment. He was also found to be a sexual predator. Adrian appeals from his convictions, raising three assignments of error on appeal. We will address them in a manner that facilitates our analysis.

{¶ 2} II. "The trial court erred and thereby deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by overruling appellant's motion for judgment of acquittal, as the prosecution failed to offer sufficient evidence to prove beyond a reasonable doubt each and every element of the offenses of attempted rape and attempted complicity to kidnapping."

{¶ 3} III. "The trial court erred and thereby deprived appellant of due process of law as guaranteed by the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution by finding appellant guilty, as the verdict for attempted rape and attempted complicity to kidnapping were against the manifest weight of the evidence."

{¶ 4} In his second and third assignments of error, Adrian claims that his convictions for attempted rape and attempted complicity to commit kidnapping were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 5} " ' "[S]ufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the

evidence is legally sufficient to support the jury verdict as a matter of law.' " *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 6} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 7} According to the state's evidence, over the course of 13 years, Adrian had a sexual relationship with Meera Good. Good had been introduced to Adrian by Judy Simons. Throughout their relationship, Adrian would provide Good money and gifts, often in exchange for sexual conduct. This relationship continued after Good's marriage. In November 2004, Good was 28 years old, married, and had three children.

{¶ 8} At the end of November 2004, Good took her seven-year-old daughter and two of her daughter's friends to Howard's IGA, a grocery store in St. Paris, Ohio, to purchase ice cream. Adrian approached Good, greeted her, and talked to her briefly. Shortly thereafter, Adrian telephoned Good and told her about an incident about six months before where he had had a young girl drugged and he had placed his penis into the child's mouth and hand while she was asleep. Adrian asked Good if she could get one of her daughter's friends so that he could

do it again. Adrian referred to the two girls that he had seen in Good's car at the grocery store.

{¶ 9} Good obtained a tape recorder and called Adrian back. She told him that she had "been contemplating everything that we talked about yesterday." Adrian repeated his desire to have sexual contact with young girls. He told Good that she could tell the child that they were going for a ride and then slip her a sleeping pill before the ride. Adrian emphasized that "we can't let them wake up. That just cannot happen."

{¶ 10} Good took the tape recording to her pastor, who directed her to law enforcement. On November 23, 2004, Good played the tape for Detective Lieutenant Rick Cron of the Piqua police department. After talking with Good and listening to the tape, Cron concluded that Champaign County had jurisdiction over the offense. Cron told Good that he would contact Champaign County and would pass along the tape and the recording of his interview with Good. Shortly thereafter, Cron contacted Detective Karen Gould of the Champaign County Sheriff's Office.

{¶ 11} Good was subsequently contacted by Gould. Gould testified that she encouraged Good to "get as much information as possible from [Adrian] on tape," and she provided Good with a topical script to follow. Over the next month, Good had numerous taped conversations with Adrian, in which she seemingly attempted to obtain an eight-year-old and a ten-year-old girl for Adrian. The tapes revealed that Adrian's plan regarding an eight-year-old child was for Good to drug her and to drive her to Adrian's home, where Adrian would get in the back of the van and engage in sexual conduct with her while she was asleep. Adrian's plan for a ten-year-old child was for Adrian and the child to play "the game," as Adrian called it. Here, Good was to bring the child to Adrian's home. Adrian would pretend to be asleep and the child would be encouraged to "experiment on him" and to have oral and vaginal intercourse.

{¶ 12} In December 2004, Good informed Adrian that she needed money and that she wanted to be paid for her efforts. On December 20, 2004, Adrian and Good met in the parking lot behind Howard's IGA. Adrian entered Good's van and gave her two $100 bills. According to Good, that money was to go toward her obtaining an eight-year-old child for him. Detective Gould observed and photographed the meeting between Good and Adrian. Immediately afterward, Good gave the money to Gould.

{¶ 13} On December 28, 2004, Good informed Adrian that she would be picking up an eight-year-old girl, Brittany, in Springfield, Ohio, and would bring her to his house. On the way to Adrian's home, Good met Chief Deputy Brett Emmons, who rode in the back of her van where, according to Adrian's plan, the child would have been located. When Good arrived at the house, Good got out of her

van and went into Adrian's home for a short time. According to Good, she told Adrian that the girl was in the van and that he should hurry out because the van was stopped. They further discussed how he would enter the vehicle, how the child would be covered, what they would do if the child awoke, and how he would get out of the vehicle. Adrian and Good then walked out to van, and Adrian opened the middle passenger doors to the back seats. At that time, Adrian was arrested by Emmons. Sheriff David Deskins and Deputy Jason Byers, who had been observing the scene, approached the van, and Adrian was transported to the sheriff's office.

{¶ 14} After his arrest, Adrian was questioned for approximately two hours by Deskins and Emmons, with Gould joining in the interview sometime after it had begun. According to Deskins, Adrian admitted during the interview that, when Good arrived at his house, he had had a conversation with her as she had described it. Throughout the interview, Adrian maintained that his conversations with Good had been "sex talk" and "fantasy."

{¶ 15} In addition to the evidence of Adrian's conversations with Good regarding his plans for Good to obtain young girls for him, the state presented evidence that Adrian had paid Judy Simons for sexual intercourse and had asked Simons to ask teenaged girls to have sex with him for money. Simons testified that Adrian had given her money for sexual intercourse, either vaginal or oral, on at least two occasions in 2004. Simons further testified that Adrian had asked her if she knew "younger girls" who wanted to have sex. Simons responded that she knew a couple of girls who might. In late summer of 2004, Simons asked J.S., a 16–year-old friend of her son, if she wanted to have sex with Adrian. Simons assumed that Adrian would pay her money in return. J.S. responded that she did not, but that she would ask her friend, K.M. K.M. also responded that she would not. Sometime later, Simons took J.S. and K.M. to the municipal airport in Urbana to look at Adrian's airplanes. Afterward, K.M. again told J.S. that she was not interested in having sex with Adrian. J.S. told K.M.'s answer to Simons. At trial, J.S. and K.M. also testified that Simons had asked them if they would have sex with Adrian for money; J.S. indicated that she was offered approximately $200. J.S. also stated that, if she had said yes, Adrian would have taken Simons to North Carolina in his airplane to pick up her son.

{¶ 16} On appeal, Adrian claims that the trial court should have granted his motion for an acquittal on the charges of attempted rape (Count One) and attempted complicity to commit kidnapping (Counts Two and Three). Counts One and Two concerned Adrian's conduct with respect to the eight-year-old child, "Brittany." Count Three concerned Adrian's conduct with respect to the ten-year-old child. Because Adrian was acquitted of Count Three, we need not address that charge.

{¶ 17} Adrian asserts that the state failed to establish the necessary elements of attempt, as set forth in R.C. 2923.02(A), in that the state failed to present evidence that he engaged in any conduct to further the offenses of rape or kidnapping. He argues that the evidence "was limited to [his] (admittedly) unpleasant recorded statements and the act of walking toward a van that was filled with law enforcement officers."

{¶ 18} For the same reasons, he further argues that these convictions were against the manifest weight of the evidence.

{¶ 19} R.C. 2923.02(A) provides: "No person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."

{¶ 20} As noted by the state, the Supreme Court of Ohio has discussed the requirements of an attempt offense where the defendant had solicited another to commit an offense. *State v. Group*, 98 Ohio St.3d 248, 2002-Ohio-7247, 781 N.E.2d 980. In *Group*, the defendant was convicted of attempted aggravated murder when, during his pretrial confinement, he solicited a fellow inmate to firebomb the home of a key witness. Although the inmate, Perry, approached the house, he took no further action after discovering that the witness was home. The Supreme Court upheld the defendant's conviction, stating:

{¶ 21} " 'A "criminal attempt" is when one purposely does or omits to do anything which is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.' *State v. Woods* (1976), 48 Ohio St.2d 127, 2 O.O.3d 289, 357 N.E.2d 1059, paragraph one of the syllabus. A 'substantial step' requires conduct that is 'strongly corroborative of the actor's criminal purpose.' Id. '[T]his standard does properly direct attention to overt acts of the defendant which convincingly demonstrate a firm purpose to commit a crime, while allowing police intervention * * * in order to prevent the crime when the criminal intent becomes apparent.' Id. at 132, 2 O.O.3d 289, 357 N.E.2d 1059.

{¶ 22} "Two Ohio courts have concluded that merely soliciting another person to commit a crime does not constitute an attempt. See *State v. Dapice* (1989), 57 Ohio App.3d 99, 104, 566 N.E.2d 1261 ('mere preparation' does not itself constitute an attempt); *State v. Valenta* (June 28, 2001), Cuyahoga App. No. 78232, 2001 WL 723247. That also appears to be the majority view nationally." (Footnote omitted.) *Group* at ¶ 95–96.

{¶ 23} The Supreme Court then cited with approval two cases from other states in which the defendant had been convicted of attempted murder after hiring someone to kill a third person. Id. at ¶ 98–99, citing *Braham v. State*

(Alaska 1977), 571 P.2d 631, and *State v. Urcinoli* (1999), 321 N.J.Super. 519, 729 A.2d 507. The court further approved of the federal court approach to the offense of attempt, which rejected a rigid or formalistic view. Id. at ¶ 100–101. Turning to the facts before it, the *Group* court found that the state had presented sufficient evidence to support a conviction for attempted aggravated murder. The court reasoned that the defendant did more than "merely solicit" the firebombing. Id. at ¶ 97. Rather, "Group's acts—offering Perry $150,000 to throw a firebomb through the window of Mrs. Lozier's house, providing him with her address, repeatedly importuning him to commit the crime, and instructing him how to make the bomb and how to misdirect any subsequent police investigation—strongly corroborate Group's criminal purpose, and therefore constitute a substantial step in a course of conduct planned to culminate in the aggravated murder of Mrs. Lozier." Id. at ¶ 103.

{¶ 24} Adrian's actions toward the commission of the rape are analogous to those in *Group*. Adrian not only asked Good if she could obtain an eight-year-old child with whom he could have sexual intercourse, Adrian paid $200 to Good for the eight-year-old child and directed her on how the offense was to be committed. Adrian told Good how she could drug the child and how the child should be located in the van. He also prepared how to exit the vehicle should the child awake. Moreover, when Good arrived at his home on December 28, 2004, and Adrian was informed that a child was in the van as they had planned, Adrian approached the vehicle and began to enter the middle passenger doors to the location where the child was to be located. As in *Group*, the state's evidence reasonably supported the conclusion that Adrian's actions constituted a substantial step in a course of conduct planned to culminate in the rape of Brittany, an eight-year-old child. See, also, *State v. Banks*, Cuyahoga App. No. 85079, 2005-Ohio-3433, 2005 WL 1541078. Adrian's conviction for attempted rape (Count One) was neither based on insufficient evidence nor against the manifest weight of the evidence.

{¶ 25} The state asserts that Adrian's conduct further supports a conviction for attempted complicity to commit kidnapping. Although we agree with the state that the facts of this case could support a conviction for a kidnapping-related offense, it is our view that the offense of which Adrian was indicted and convicted—attempted complicity to commit kidnapping—does not exist under Ohio law.

{¶ 26} R.C. 2905.01 sets forth the offense of kidnapping. It states:

{¶ 27} "(A) No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

{¶ 28} "(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will."

{¶ 29} The complicity statute, R.C. 2923.03, reads:

{¶ 30} "(A) No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:

{¶ 31} "(1) Solicit or procure another to commit the offense;

{¶ 32} " * * *

{¶ 33} "(C) *No person shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an attempt to commit an offense in violation of section 2923.02 of the Revised Code.*" (Emphasis added.)

{¶ 34} As noted by the state, the state's evidence demonstrated that Adrian intended that an eight-year-old girl, Brittany, was to be drugged with Nyquil or another substance, rendering her asleep so that he could engage in sexual activity with her against her will. Such conduct, if performed by Adrian, would be sufficient to establish the offense of kidnapping. The state's evidence further established that Adrian solicited Good to drug Brittany and to bring her to him for the purpose of his engaging in sexual activity with her in Good's van while the child slept. The kidnapping and the sexual activity with Brittany never occurred, however. As established by the state's evidence, Good notified law enforcement, she never made efforts to obtain an eight-year-old, and Brittany was a fictitious child. Because there was no completed offense, there was insufficient evidence to convict Adrian of complicity to commit kidnapping. At best, he could have been charged with complicity to commit attempted kidnapping. See R.C. 2923.03(C).

{¶ 35} The purported offense of attempted complicity to commit kidnapping is not equivalent to complicity to commit attempted kidnapping. While the complicity and attempt statutes contemplate complicity to commit an attempted offense where the offense is not actually committed, they do not contemplate the offense of attempted complicity.

{¶ 36} Because Adrian cannot have committed the offense of attempted complicity to commit kidnapping, as a matter of law, the state necessarily failed to present sufficient evidence to support his conviction for that offense. Moreover, the conviction is necessarily against the manifest weight of the evidence.

{¶ 37} The second and third assignments of error are sustained in part and overruled in part.

{¶ 38} I. "The prosecuting attorney's request of a witness to comment on appellant's credibility, along with the prosecutor's remarks during closing arguments, constituted prosecutorial misconduct which deprived appellant of a fair

trial in violation of the Fourteenth Amendment to the United States Constitution and comparable provisions of the Ohio Constitution."

{¶ 39} In his first assignment of error, Adrian claims that the prosecutor engaged in misconduct when he asked a witness for an opinion of Adrian's credibility and asked the jury during closing argument whether they would leave their daughters or granddaughters with Adrian.

{¶ 40} In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." *State v. Jones* (2000), 90 Ohio St.3d 403, 420, 739 N.E.2d 300, citing *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883. "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See *State v. Loza* (1994), 71 Ohio St.3d 61, 78, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. *Darden v. Wainwright* (1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.

{¶ 41} During the state's case, the prosecutor questioned Sheriff Deskins about his interview with Adrian after his arrest. After the audio recording of the interview had been played for the jury, the prosecutor and Deskins engaged in the following colloquy:

{¶ 42} Q: "David, you made reference a number of times to Dan Adrian tell us the whole story, good, bad, ugly, no surprises. This is your chance. Tell us the whole thing. Why were you taking that approach?"

{¶ 43} A: "That's kind of the standard that I have set at the sheriff's office to get all the facts best we can when we interview people or out gathering information. I try not to—I try to set the perspective that we want everything, not to be selective in what we report or what we hear but to take those things that would be against the case, take the things that are just repulsive. The good, bad and ugly is kind of the standard benchmark that I use."

{¶ 44} Q: "Okay. Did you consider Dan Adrian when he repeated his 'I don't knows' and 'give me more information and maybe I can recall' to be evasive?"

{¶ 45} Defense counsel objected to the question, and the court overruled the objection. Deskins answered affirmatively. Deskins explained that "it was obvious to me as an interviewer that Dan * * * wanted to present himself as being cooperative but he would not tell us things that we did not already know."

{¶ 46} The prosecutor later asked Deskins:

{¶ 47} Q: "Did you ask Dan about the reasonable man interpretation of his comments?

{¶ 48} A: "Yes, I did.

{¶ 49} Q: "Why did you do that?

{¶ 50} A: "Again to appeal to his sense of reasonableness and really the reality check—what he was saying about this being a fantasy, sex talk, that sort of thing just did not jive with—

{¶ 51} Defense Counsel: "Object, Your Honor, as to his conclusion about what jives and what doesn't.

{¶ 52} Court: "Objection is overruled. You may continue.

{¶ 53} A: "His version versus what we had as far as the recorded tapes—I saw a big gap there as far reality check. So I asked him would he agree with me that a reasonable person would not believe him in that this was fantasy and he agreed that that would be true."

■■ {¶ 54} Adrian asserts that the prosecutor's questions improperly elicited Deskins's opinion of Adrian's credibility. In *State v. Boston* (1989), 46 Ohio St.3d 108, 545 N.E.2d 1220, the Supreme Court of Ohio held that an expert may not comment on the credibility or veracity of a witness. This court has stated that the rule announced in *Boston* applies to police officers as well as expert witnesses, because a juror is likely to perceive an officer as an expert and because the rule applies to lay persons as well as experts. *State v. Miller* (Jan. 26, 2001), Montgomery App. No. 18102, 2001 WL 62793; *State v. Travis,* 165 Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237, ¶ 53.

■ {¶ 55} In our view, the prosecutor's questions did not cross the line demarcated in *Boston*. Deskins's testimony that he perceived Adrian as evasive or uncooperative was a comment on Adrian's behavior and not necessarily an opinion on whether Adrian's statements to the officers were truthful. Likewise, Deskins's statement that Adrian's version of events appeared inconsistent with the recorded conversation between him and Good did not constitute an opinion that Adrian was lying to the officers. Although Deskins's testimony may have assisted the jury in assessing Adrian's credibility, the prosecutor did not solicit the sheriff's opinion as to whether Adrian should be believed. Moreover, even if the sheriff's statement were improper, we find such testimony was harmless in light of the fact that, during the interview, Adrian had agreed with Deskins that a reasonable person would not believe that the discussed sexual conduct with a child was a fantasy.

{¶ 56} Adrian further claims that the prosecutor engaged in misconduct by making the following statements during his rebuttal closing argument:

{¶ 57} PROSECUTOR: "All right. It's very clever to ask about your machine shop or your truck delivery. But I guess I would do the same for you. Would you feel comfortable leaving your grandchild between ages seven and ten with Dan Adrian?"

{¶ 58} DEFENSE COUNSEL: "Object.

{¶ 59} THE COURT: "Overruled.

{¶ 60} PROSECUTOR: "Would you feel comfortable having Dan Adrian give your teenage daughter or grandchild cigarettes—money for cigarettes, groping them?

{¶ 61} DEFENSE COUNSEL: "Object, Your Honor. That is not the evidence.

{¶ 62} THE COURT: "Overrule the objection. The Court is not finding it's the evidence. These are comments on the evidence. The jury will decide what the evidence is. Proceed."

{¶ 63} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. *State v. Ballew* (1996), 76 Ohio St.3d 244, 255, 667 N.E.2d 369; *State v. Stevens*, Montgomery App. No. 19572, 2003-Ohio-6249, 2003 WL 22764527, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." *State v. Lott* (1990), 51 Ohio St.3d 160, 165, 555 N.E.2d 293, quoting *State v. Stephens* (1970), 24 Ohio St.2d 76, 82, 53 O.O.2d 182, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." *Stevens*, supra, citing *Ballew*, supra, and *State v. Lorraine* (1993), 66 Ohio St.3d 414, 420, 613 N.E.2d 212.

{¶ 64} Adrian claims that the prosecutor's comments during closing argument inappropriately "suggest[ed] to jurors that personal discomfort with Appellant's character required a conviction, and the gratuitous reference to groping jurors' granddaughters was wholly unsupported by the evidence at trial." He argues that the prosecutor's statements were intended to "inflame the passions of the jury" in order to gain a conviction.

{¶ 65} Upon reviewing the closing arguments in their entirety, we find no misconduct on the part of the prosecutor. In these remarks, the prosecutor was responding to defense counsel's prior closing argument, in which he asserted that Good was "incredible" and "untrustworthy." In his closing argument, defense

counsel had asked jurors whether they would take their child to Good if she were a doctor, whether they would be comfortable getting into a truck that Good had worked on if she were a truck assembler, and whether they would let their children ride with Good. Defense counsel continued: "You wouldn't even let your children ride with Meera Good. Ever. Ever. Ever. Ever. And the government wants you to take her word for what happened." Although the prosecutor's statements in his rebuttal appear, on their face, to be inflammatory, we conclude that when read in context of the closing arguments in their entirety, they did not exceed the latitude afforded to counsel.

{¶ 66} In addition, the prosecutor's allusion to Adrian providing teenagers money for cigarettes and groping was not unsupported by the record. J.S. and K.M. had testified that Adrian had, through Simons, offered them money for sexual relations. In addition, J.S., K.M., and Simons indicated that Adrian had given $20 to the girls when they were leaving the Urbana airport after their visit to see his airplanes. K.M. testified that Adrian had given $20 to her and J.S. after he had asked Simons if "the girls need money for cigarettes or something."

{¶ 67} The first assignment of error is overruled.

{¶ 68} The judgment of the trial court will be vacated as to Adrian's conviction for attempted complicity to commit kidnapping. In all other respects, the judgment of the trial court will be affirmed.

Judgment accordingly.

FAIN and DONOVAN, JJ., concur.

DONOVAN, Judge, concurring.

{¶ 69} I write separately only to note that I disagree with the majority's conclusion that the prosecutor's questions did not cross the line demarcated in *Boston*. By opining that Adrian's statements were "evasive" and "do not jive," Deskins's testimony was clearly intended to suggest that Adrian's statements were deceptive and misleading. In fact, the American Heritage Dictionary of the English Language (4th Ed.2004), defines "jive" as slang for "deceptive."

{¶ 70} However, I find that the improper questions and comments on credibility, taken in the context of the entire trial, do not taint the jury's verdicts given the evidence adduced by the state. I am satisfied that the jury would have found Adrian guilty even absent these improper questions. Accordingly, I cannot say Adrian has been prejudiced.