JOURNAL ENTRY AND OPINION
{¶ 1} Defendant-appellant Jay Goldblatt appeals from his convictions for compelling prostitution and possession of criminal tools at the conclusion of a trial to the bench.
 {¶ 2} Appellant argues that the state presented insufficient evidence to sustain his conviction for compelling prostitution, and, thus, by extension, his conviction for possession of criminal tools cannot stand. He further argues that neither of his convictions finds support in the weight of the evidence.
 {¶ 3} The state has filed a cross-appeal, designated App. No. 87462, in which it argues the trial court abused its discretion in denying the state the opportunity to present certain evidence during appellant's sexual offender classification hearing.
 {¶ 4} After a consideration of the record, this court concludes the trial court committed no error in determining appellant's guilt. Consequently, appellant's convictions are affirmed.
 {¶ 5} Furthermore, the trial court acted within its discretion in preventing the state from introducing evidence it failed to make available to appellant in a timely manner; the court only enforced an order it issued prior to the classification hearing. The state's cross-appeal, therefore, is denied.
 {¶ 6} Appellant's convictions result from a tip provided to the Cleveland office of the Federal Bureau of Investigation ("FBI") in June, 2004. The tipster indicated she had been in internet contact with "an individual named Buddy [who] had an interest in young children for sex."[1] The information went to the "cyber crimes squad," led by Bradley Rex.
 {¶ 7} Rex spoke with the tipster personally, believed her account, and requested her to contact "Buddy" to inform him that "she could not provide a child to have sex with, but she knew someone who could, and that person would be in contact with him." In this manner, an agent posing as a "pimp" directly could communicate with the suspect.
 {¶ 8} The tipster agreed. Later that same day, she informed Rex that "she had completed the task," and "Buddy" knew someone named Scott would be telephoning him. She provided "Buddy's" telephone number to Rex.
 {¶ 9} On June 18, 2004, Rex directed his colleague Scott Romus to telephone "Buddy," who later was identified as appellant. The conversation was tape-recorded. In it, Scott introduced himself as the person who was told to call appellant by the tipster.
 {¶ 10} Appellant expressed interest in what Scott had for him. Scott asked what appellant was looking for, and appellant responded, "Something young." He added, "the younger, the better." Appellant wanted reassurance that they would "do stuff;" he wondered if Scott had ones he knew that had "done stuff before."
 {¶ 11} As the conversation proceeded, appellant confided that he was new at this type of commerce. He inquired about the price of obtaining someone who would let him "play with her, look at her, * * * dance." He added that the more she would "do," the "happier" he would be; he even would like to "stick it in her" if she were "willing."
 {¶ 12} Scott indicated he would "put some feelers out" to see what was "available" and call back. Appellant stated he could be contacted "Monday through Friday," and that early morning or late afternoon would be "the best time" for him.
 {¶ 13} Upon providing this information, appellant again inquired about the rate. Scott indicated what appellant wanted would be "a little more expensive" than an ordinary "prostitute." Scott quoted a range of "a few hundred [to] five hundred dollars." In response, appellant informed Scott that, for the price charged, he "prefer[ed] a white girl" of "ten or eleven" years old, and acknowledged he wanted to go "as far as [he] could" with her.
 {¶ 14} When the call concluded, Rex proceeded to identify the telephone number's subscriber. The number was listed to the Pubco Corporation. The company's administrator, Steve Kalette, informed Rex that the number was appellant's direct line.
 {¶ 15} Scott placed a second call to appellant at 1:15 p.m. on July 13, 2004. He apologized for taking so long and indicated he had someone "lined up for" appellant. Appellant wanted Scott to "tell [him] about her."
 {¶ 16} Scott described the person as "eleven or twelve" years old, "four foot ten, about eighty pounds." In response to appellant's additional queries, Scott further stated she was "white," with "blonde" hair. Appellant then indicated he didn't seek to "force her to do anything;" he was willing to "do whatever the girl would do."
 {¶ 17} This led appellant to ask if the girl were "experienced." Specifically, appellant wanted to know if she would "suck," and asked "what [would] two hundred get?" He further confided that the "perfect girl" would be "not developed." He at least wanted to engage in "touching, maybe licking."
 {¶ 18} Appellant further wanted to know if "this girl would get paid, depending on what she [did]?" Scott said something about having to obtain the girl's services through her mother, who needed "a few bucks," but appellant interrupted the explanation to ask "when" he could "meet her," and, again, "[w]hat would two hundred get?"
 {¶ 19} Scott responded that appellant could have "pretty much what [he was] asking for," since he "talked about using [his] hands and mouth." When Scott suggested appellant could "go further" for "a little bit more," appellant told him they should "start with the two hundred and see." Appellant further commented that, while tomorrow was "terrible," on the other hand, "[t]oday's a great day," and he was available at "the end of the day."
 {¶ 20} At this, Scott proposed a meeting place. He suggested the marina area at the Rocky River Metropark. Appellant seemed unfamiliar with the place, so Scott described it. Afterward, appellant wanted to be reassured that "[s]he knows what to do," and "[s]he's done it before and she likes it." When he received these assurances, appellant stated that "[t]oday" at "[l]ike 4:00 [wa]s great." He asked for directions, informed Scott he would be driving a grey Chrysler, wanted to know what Scott's car looked like, and told Scott to "call [him] if [they] could set something up today." Scott agreed.
 {¶ 21} Approximately a half-hour later, Scott telephoned appellant. Although he later discovered the tape recorder did not receive appellant's side of the conversation, Scott provided additional directions for the proposed meeting. He told appellant he would be at the westernmost parking lot in a brown Grand Prix.
 {¶ 22} After listening to appellant, Scott stated, "Her first name is Lisa." Scott repeated appellant's description of his car, ensured that he was "bringing cash" in the amount of "two hundred," and told appellant "they" wanted "to clarify" he intended to be "kissing her * * * [e]verywhere." Before concluding the call, Scott asked if appellant was "going to be there around four," and told him they would "be looking for" him.
 {¶ 23} Once this call was made, Rex assigned additional FBI agents in separate cars to watch appellant's place of business. They observed appellant's car leave the parking lot at approximately 3:00 p.m. The agents followed appellant as he stopped at a nearby bank, used the automated teller machine, and then drove onto the freeway.
 {¶ 24} Appellant proceeded to the assigned area. Since it was not yet 4:00 p.m., he drove further before turning around, but, at approximately 3:55, he pulled into the marina driveway, proceeded to the westernmost parking area, and parked near the brown Grand Prix waiting there. Rex and his colleagues at that time stopped appellant and placed him under arrest.
 {¶ 25} In the subsequent search of appellant's person, they found he had a bank envelope that contained exactly two hundred dollars, along with the bank receipt showing the withdrawal of the money from his account occurred at 3:08 p.m., and one of his business cards, with handwritten notations of the directions he had been given to the marina area on its reverse side. These items were separately carried from the pocket in which he carried his wallet.
 {¶ 26} Appellant subsequently was indicted on four counts that charged him with compelling prostitution, R.C.2907.21(A)(3), attempted rape, attempted kidnapping, and possession of criminal tools, to wit: car and/or money. Appellant executed a waiver of his right to a jury trial, and trial proceeded on September 19, 2005.
 {¶ 27} After hearing the testimony of the state's witnesses, the trial court granted appellant's motions for acquittal on the attempted rape and attempted kidnapping charges. Appellant then testified in his own behalf. The trial court ultimately found appellant guilty of the remaining two counts.
 {¶ 28} The court's journal entry of verdict, dated October 6, 2005, contained each of the additional pronouncements made on the record at the conclusion of trial, i.e., 1) a sexual offender classification hearing was to be held prior to sentencing; 2) the state was ordered to "provide notice by 10/19/05 to [defense] counsel and the court of its intent to seek a sexual predator classification and the evidence to be presented;" 3) appellant was referred for a presentence report and a sex offender assessment; and 4) appellant was to send the court periodic reports of his continuing psychological therapy treatments. Additionally, appellant's sentencing was set for November 9, 2005.
 {¶ 29} The record reflects the state filed a "notice of its intent to seek sexual predator classification" against appellant on October 18, 2005. No further information was provided.
 {¶ 30} Appellant's case was called for the sexual offender classification and sentencing hearing as scheduled. Upon being informed the state provided defense counsel with "a letter dated November 3, 2005" which indicated its intent to present four witnesses, the court reminded the prosecutors of the terms set forth in the previous journal entry. As a consequence of the state's failure to abide by those terms, the court prohibited the state from introducing any of these witnesses.
 {¶ 31} After considering the evidence presented, the trial court classified appellant as a sexually oriented offender. The court sentenced appellant for his convictions to a five-year term of conditional community control sanctions.
 {¶ 32} Appellant challenges his convictions with four interrelated assignments of error.
 {¶ 33} "I. The trial court erred in denying the appellant's motion for judgment of acquittal as to counts one and four, compelling prostitution and possession of criminal tools.
 {¶ 34} "II. There was insufficient evidence to convict the appellant of compelling prostitution and possession of criminal tools.
 {¶ 35} "III. The appellant's conviction is against the manifest weight of the evidence.
 {¶ 36} "IV. The state's evidence failed to prove the facts contained in the indictment."
 {¶ 37} In these assignments of error, appellant argues his conviction for compelling prostitution cannot stand because the evidence showed no actual minor victim, i.e., no "Jane Doe," as alleged in the indictment, existed. He thus contends that the trial court erred in failing to grant his motion for acquittal on this count, and that his conviction is against the manifest weight of the evidence.
 {¶ 38} He additionally claims on this basis that because he committed no criminal offense, his conviction for possession of criminal tools also must be reversed.
 {¶ 39} A defendant's motions for acquittal should be denied if the evidence is such that reasonable minds could reach different conclusions as to whether each material element of the crime has been proven beyond a reasonable doubt. State v.Dennis, 79 Ohio St.3d 421, 1997-Ohio-372; State v. Jenks
(1991), 61 Ohio St.3d 259; State v. Bridgeman (1978),55 Ohio St.2d 261. The trial court is required to view the evidence in a light most favorable to the state. State v. Martin (1983),20 Ohio App.3d 172.
 {¶ 40} With regard to an appellate court's function in reviewing the weight of the evidence, this court is required to consider the entire record and determine whether in resolving any conflicts in the evidence, the factfinder "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v.Martin, supra at 175.
 {¶ 41} This court must be mindful, therefore, that the weight of the evidence and the credibility of the witnesses are matters primarily for the factfinder to consider. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 42} Appellant in this case was charged with violating R.C.2907.21(A)(3). The indictment stated he had "knowingly * * * agreed to pay Jane Doe, a minor, * * * through her agent, so that she would engage in sexual activity, whether or not * * * [he] knew the age of Jane Doe * * *."
 {¶ 43} Appellant initially argues that in the context of sexual offenses, the term "minor" proscribes only conduct involving an "actual minor," rather than a fictitious one. He cites State v. Huffman, 165 Ohio App.3d 518, 2006-Ohio-1106, as authority for this argument.[2] Appellant further argues that the evidence failed to establish an "agreement" was in place.
 {¶ 44} In view of the fact that Huffman does not directly address the elements of R.C. 2907.21(A)(3), this court declines to find it applicable herein. Rather, in State v. Adrian,
Champaign App. No. 2005 CA 23, 2006-Ohio-4143, is more persuasive in analyzing appellant's initial argument, since there the facts are similar to those presented in this case.
 {¶ 45} In Adrian, the defendant contacted an adult former girlfriend whom he knew had young daughters and asked her if she could arrange to have a girl of her daughters' age drugged and provided to him for his sexual enjoyment. The woman passed the information to law enforcement officers, who encouraged her to lead Adrian to believe she could make such an arrangement, and then arrested Adrian when he appeared for the encounter. Adrian paid the woman two hundred dollars, directed the details of the proposed encounter, and appeared for it.
 {¶ 46} Although no actual young girl either existed or was at the location upon his arrival, the appellate court determined Adrian's convictions for both compelling prostitution and attempted rape were supported by sufficient evidence and by the weight of the evidence. The appellate court discounted Adrian's claim that the evidence presented had been limited to only "recorded statements and the act of walking toward a van" which contained only "law enforcement officers." Id., at ¶ 17. Viewing the evidence in a light most favorable to the prosecution, "Adrian's actions constituted a substantial step in a course of conduct planned to culminate in the [prostitution and] rape of Brittany, an eight-year old child." Id., at ¶ 23.
 {¶ 47} The Ohio Second Appellate District's reasoning with regard to whether the evidence proved the necessary elements of the crime is sound. In this case, as in Adrian, appellant spoke with a person who played the role of a child's agent; although no actual child existed, the tape recordings showed a plan for the agent to bring the child to him for him to engage in sexual activity with her.
 {¶ 48} Appellant's further argument concerns the proof of the element of an "agreement." Appellant contends the facts of this case are similar to those presented in State v. Gann (2003),154 Ohio App.3d 170, and compel a conclusion that an "agreement" to pay for the sexual services of a minor was not yet made.
 {¶ 49} However, when the evidence is viewed in a light most favorable to the prosecution, it is clear appellant was fully prepared to pay Scott two hundred dollars in order to perform oral sex with a ten or eleven year-old girl. State v. Adrian,
supra; cf., State v. Williams, Cuyahoga App. No. 86964,2006-Ohio-3706.
 {¶ 50} Scott told appellant details about the girl he proposed to bring, and appellant arranged the time, assented to the place suggested, and obtained the money before his arrival. Appellant then came to the arranged location at the arranged time with the arranged money. Before doing so, appellant indicated he would consider additional deals later.
 {¶ 51} On the facts presented herein, appellant's conviction for compelling prostitution is supported by sufficient evidence. It follows that the money he brought was sufficiently proved to be intended for criminal purposes. Accordingly, the trial court properly denied his motions for acquittal of these charges.
 {¶ 52} Similarly, appellant's convictions for compelling prostitution and possession of criminal tools are supported by the weight of the evidence. In his testimony, appellant admitted he was "talking with somebody named Scott" with the intent "to meet with a young girl." Appellant also admitted he wanted to ensure the girl was "sexually experienced," so that he could perform "oral sex" on him, and he further admitted he brought two hundred dollars with him knowing he would "be paying it for sex with a young girl."
 {¶ 53} Since appellant's convictions, therefore, are supported by both sufficient evidence and the weight of the evidence, his assignments of error are overruled.
 {¶ 54} Appellant's convictions, accordingly, are affirmed.
 {¶ 55} In its cross-appeal, the state presents one assignment of error:
 {¶ 56} "I. The trial court erred by denying the state the opportunity to present evidence in support of the sexual predator adjudication."
 {¶ 57} The state argues the trial court acted improperly in prohibiting it from introducing any witnesses at the sexual classification hearing. This court disagrees.
 {¶ 58} A trial court is vested with "broad discretion in regulating discovery," and may make deadlines and specify the manner of discovery. State v. Brooks, Jefferson App. No. 04 JE 10, 2004-Ohio-4546, ¶ 26. Furthermore, the court is vested with discretion in determining the sanction to be imposed for a party's nondisclosure of discoverable material; thus, this court reviews the trial court's decision only for an abuse of its discretion. Id., ¶ 42. Since R.C. 2950.09(B) gives the defendant the right to present evidence at a sexual classification hearing, it "implicitly recognizes a defendant's right to procure that evidence prior to the hearing." State v. Sahady, Cuyahoga App. No. 83247, 2004-Ohio-3481, ¶ 21; cf., State v. McKinney (Jan. 25, 2001), Cuyahoga App. No. 77659.
 {¶ 59} The record reflects that after pronouncing its verdict in appellant's trial, the court stated in pertinent part as follows:
 {¶ 60} "* * * I * * * ask the State of Ohio to give notice of its intention to seek a sexual predator classification for [appellant] no later than October 19th.
 {¶ 61} "* * * [T]hat notice should be in writing to the Court, as well as Defense Counsel.
 {¶ 62} "I will expect the Prosecutors to also give Defense Counsel a full outline of the evidence they expect to present on that issue, so that Defense Counsel can prepare any challenge * * * intelligently.
 {¶ 63} "* * * What I propose is that we set sentencing for November 7th at nine o'clock, with a view that if [the prosecutors] give notice * * * and what the evidence might be, then that might give Defense Counsel time * * *."
 {¶ 64} The parties discussed the matter and settled on November 9th as the most convenient date for the classification and sentencing hearing. When the state filed its notice of intent to pursue a sexual predator classification against appellant, however, no written outline of evidence was attached.
 {¶ 65} The hearing was called as scheduled. Defense counsel informed the court that he "received from the prosecution a letter dated November 3, 2005" which indicated they intended to call four witnesses, but that he received the witnesses' names only "yesterday." The prosecutors explained they thought they were required simply to notify the defense of their "intent," therefore, they fully had complied with the court's previous order.
 {¶ 66} The trial court remained unconvinced. It referred to its prior journal entry that indicated otherwise, and informed the prosecutors that it made the order to expedite matters and to eliminate misunderstanding. The court held that it was "not going to permit the State of Ohio to violate this Court's orders which were put on to ensure efficiency and protect the rights of the defendant to be given advance notice of what [he was] going to be facing at this hearing."
 {¶ 67} The state was precluded from presenting its surprise witnesses. The court permitted the state, however, to utilize the presentence report, the trial evidence, and the results of the psychological assessment of appellant.
 {¶ 68} Under these circumstances, this court cannot conclude the trial court abused its discretion. State v. Brooks, supra. The journal entry plainly set forth exactly what had been stated on the record at the conclusion of trial. The trial court simply determined the consequences for the state's failure to abide by its order prevented the state from "sandbagging" the appellant.
 {¶ 69} Moreover, the state was not precluded from presenting any evidence. Rather, it was afforded the opportunity to present a case. The nature of appellant's crime nevertheless reasonably fit a classification of "sexually oriented offender."
 {¶ 70} For the foregoing reasons, the state's cross-assignment of error is overruled.
 {¶ 71} The trial court's order is affirmed. It is ordered that appellee recover from appellant costs herein taxed. The court finds there were reasonable grounds for this appeal. It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence. A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Celebrezze, Jr., P.J. and Blackmon, J. concur.
[1] Quotes indicate trial testimony.
[2] The Ohio Supreme Court has accepted this case for review as conflicting with the decisions of other appellate districts on the constitutionality of R.C. 2907.321.