OPINION
{¶ 1} In this case, Christopher Reese appeals from a conviction on two counts of rape. Following the jury trial and conviction, Reese was sentenced to nine years in prison on each count, with the terms to be served concurrently. He was also classified as a sexually oriented offender.
 {¶ 2} In support of the appeal, Reese raises the following assignments of error:
 {¶ 3} "I. Appellant's conviction was against the manifest weight of the evidence.
 {¶ 4} "II. Appellant's sentence is improper pursuant to the sentencing guidelines."
 {¶ 5} After considering the record and applicable law, we find the first assignment of error without merit. The second assignment of error must be sustained, pursuant to State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 245 N.E.2d 470. Accordingly, Reese's sentence will be reversed and vacated, and this matter will be remanded for re-sentencing. In all other respects, the judgment of the trial court will be affirmed.
 I {¶ 6} The incident at issue in this case took place in the early morning hours of March 22, 2005. At the time, the alleged victim, T.E., was living in an apartment with her baby daughter, who was less than two months old. T.E. had cerebral palsy, which had caused mild physical impairments like a slow gait and a contracted hand, as well as mild mental retardation. The baby's father, who was nicknamed "Cortez," had also been living at the apartment, but T.E. had kicked Cortez out around the beginning of March.
 {¶ 7} Reese and Cortez were friends, and Cortez had asked T.E. to let Reese stay in the apartment because Reese needed a place to stay. Consequently, T.E. gave Reese a key to the apartment, and he stayed overnight on several occasions in March. The number of times Reese stayed overnight was disputed, but there was no dispute about the fact that T.E. and Reese were good friends and had no problems before the night of the alleged rape. There was evidence that Reese was interested romantically in T.E., and that she did not reciprocate his feelings.
 {¶ 8} On the evening of March 21, 2005, T.E. and Reese were in the apartment with several other people, including T.E.'s best friend, Corena, and Corena's boyfriend, Theodore. Also present were Reese's friend, Fred, and a young man named Lamar. Lamar was Theodore's friend, and T.E. was also interested in dating Lamar. That night, the people at the apartment smoked marijuana and sat around talking. Reese smoked marijuana and was also drinking. At some point, Reese and Fred left and went to a bar. T.E.'s other friends left later in the evening. Lamar was the last one to leave. He testified that T.E. was fine when he left.
 {¶ 9} After everyone left, T.E. put her baby to sleep in her own (T.E.'s) bed, and then went to sleep next to the baby. Some time later, T.E. woke up because she heard Reese put the key into the door. From this point on, there are disputes about what happened. T.E. testified that Reese came in, sat on her bed for a bit, and then began kissing her all over. When he started, T.E. told him to quit, but he would not. T.E. pushed at Reese's shoulder, but he was much larger than she was. Reese put his tongue and also his finger inside her vagina. T.E. claimed that she felt pain at one point that was so bad that she had to walk with her legs apart. After Reese stopped, T.E. went into the bathroom, where she discovered that she was bleeding and that she was swollen. She was also unable to use the bathroom.
 {¶ 10} While T.E. was in the bathroom, she called the Miami Valley Hospital Online Clinic. She knew the number because she had been treated there for burns in December, 2003. T.E. explained to the clinic that she had been raped, and was told that she should come to the hospital. Because T.E. was afraid to leave her daughter in the apartment with Reese, she went back to her bed and laid down. T.E. claimed that Reese had already left the apartment by the time she came back from the bathroom. T.E. said that when she locked the door to the apartment, she saw Reese going out towards the gate outside to get in a car. According to T.E., this was around 2:00 or 3:00 a.m.
 {¶ 11} The next morning, T.E.'s friend, Myesha, came over, and T.E. told Myesha that Reese had raped her. Myesha then went to Theodore's apartment, because he lived nearby, and woke Theodore up. This was around 8:00 or 9:00 a.m. When Theodore ran over to see what was going on, T.E. was outside her apartment, roaming around. She was wearing her nightgown and it was full of blood. Theodore told T.E. to call 911 and insisted that she go to the hospital.
 {¶ 12} When the police arrived at T.E.'s apartment, T.E. was upset and her entire body was shaking. The police observed fresh blood on her nightgown. An ambulance took T.E. to the hospital, where she was examined by a sexual assault nurse examiner. T.E. was crying and tearful and was difficult to understand. T.E. said she had been penetrated with fingers, a tongue, and perhaps a foreign object. Due to swelling of T.E.'s external genitalia, the nurse initially could not insert a speculum to look inside the vaginal area. Eventually, a smaller speculum was inserted, and the medical personnel determined that the bleeding was due to T.E.'s normal menstrual cycle. The blood was trickling out of the area of the cervix where it would normally be coming from during a period. This was T.E.'s first period after her pregnancy, and first periods are typically heavier than normal.
 {¶ 13} T.E. had moderate swelling of her external area and urethra. Eventually, hospital personnel inserted a catheter because they were not successful in getting T.E. to urinate. T.E. was then sent home with the catheter. The medical record indicates that additional injuries were observed, including an abrasion inside the vagina, near the top of the cervix, and a small bruise on the posterior fourchette. Swabs taken at the hospital did not disclose the presence of semen.
 {¶ 14} Although Reese did not testify, the statement he gave to the police was introduced into evidence. Reese was arrested at around 11:00 a.m. on March 22, 2005, at the restaurant where he worked.
 {¶ 15} Reese told the police that while he normally slept on the couch, T.E. had asked him to sleep in her bed for about a month before the alleged rape, because she was scared. Before the night of the alleged rape, Reese had been fully clothed while in bed, and he and T.E. had never had any type of sexual relations. On the evening of March 21, 2005, Reese had a few drinks at the apartment and then went to the Blue Note Bar, where he had three more drinks. When he got back to the apartment, he asked T.E. if he could get in bed, and she said yes. They started kissing and he stuck his finger in her vagina briefly and then put in his tongue. Reese claimed that T.E. enjoyed it and was not hurt. After these events occurred, Reese began taking off his clothing because he thought they were going to have sex. At that point, T.E. got up and went into the bathroom. When T.E. came out, she was crying, and said her vagina was swollen and red. She was talking to someone, perhaps a doctor, on the phone. T.E. also said, "Why did I do this? Cortez gonna kill me."
 {¶ 16} Afterwards, Reese and T.E. went to sleep. When Reese woke up around 6:30, he called his mother for a ride to work. As we mentioned, Reese was arrested later that day at his place of employment.
 {¶ 17} Reese offered testimony from his mother, who said that she did pick him up at T.E.'s apartment on the morning of March 22, 2005. Reese's sister also testified that she had called T.E. the day after the alleged rape. At that time, T.E. told her that she was "fooling around" with Reese, and that they had smoked marijuana. T.E. also told Reese's sister that when she said she was hurting, Reese stopped.
 {¶ 18} There were some inconsistencies in T.E.'s testimony. For example, T.E. told the police the morning of the alleged rape that she was in bed asleep and woke up to find Reese's head between her legs. She also told the police that after Reese did this, she fell back to sleep. T.E.'s testimony at trial, only four months later, was different, i.e., she said Reese came in and sat down on the bed for a bit, and then started kissing her all over.
 {¶ 19} T.E. told the nurse at the hospital that Reese had pulled off her panties. In contrast, T.E. said at trial that Reese did not take off her panties and had only moved them over. T.E. also gave conflicting statements at the hospital about Reese. At one point, T.E. said that Reese was gone when she came out of the bathroom. However, T.E. also told the nurse that when she went back to bed after going to the bathroom, Reese was "playing with himself" and no further assault occurred. She then went to sleep, and when she awoke, Reese was gone.
 {¶ 20} At trial, T.E. initially said that Reese left around 2:00 or 3:00 a.m. She denied that Reese left when he said he did, i.e., around 7:00 a.m. On redirect examination, however, T.E. stated that it was light out when Reese left — "it was like mid-day morning, like coming into the morning" when she saw Reese get into the car.
 {¶ 21} If Reese actually left around 2:00 or 3:00 a.m., one wonders why T.E. would sit in her apartment, bleeding, for six hours or more before summoning help or going to the hospital. By the same token, if Reese did leave around 7:00 a.m., that tends to corroborate his version of the story. The fact that the victim could fall asleep in bed with her alleged rapist also raises questions.
 {¶ 22} Finally, T.E. admitted that she did say that her ex-boyfriend, Cortez, would kill her if he found out. This is consistent with the statement Reese attributed to T.E. after the alleged attack. T.E.'s explanation of her comment was that Cortez had a bad temper and would probably have taken the situation out on her, or would have tried to hurt her, because men tended to stick together in sexual matters.
 {¶ 23} Based on the these inconsistencies, Reese claims the verdict was against the manifest weight of the evidence. The standard for assessing such challenges is that, after reviewing the entire record, the appellate court:
 {¶ 24} "`weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541.
 {¶ 25} Even where a victim's testimony is contradictory, courts hold that the jury "was in the best position to weigh the evidence, and was free to believe all, some or none of the victim's testimony." State v. Muhleka, Montgomery App. No. 19827, 2004-Ohio-1822, at ¶ 53, citing State v. Jackson (1993),86 Ohio App.3d 29, 33, 619 N.E.2d 1135.We have said many times that a function of the trier of fact is to resolve conflicting testimony. State v. Beal, Clark App. No. 2005-CA-49, 2006-Ohio-2355, at ¶ 11.
 {¶ 26} To decide the manifest weight issue, we have reviewed the entire record, including videotape of most parts of the trial, including T.E.'s testimony, the testimony of the factual and medical witnesses, and the entire defense case. We are troubled by some of the inconsistencies, but do not feel there is enough doubt to justify setting aside the jury verdict. T.E. was mentally slow, and was also very upset at the time of the incident, which could account for some variations in her testimony. Notably, T.E.'s testimony was consistent on the elements of the crime. The record also contains physical evidence of injuries (external swelling of genitalia, a bruise on the posterior fourchette, and an abrasion on the cervix) that are not satisfactorily explained by Reese's account of events. Therefore, we cannot say that this is the exceptional case in which the evidence weighs heavily against conviction.
 {¶ 27} Based on the preceding discussion, the first assignment of error is without merit and is overruled.
 II {¶ 28} In the second assignment of error, Reese contends that his sentence is improper pursuant to the sentencing guidelines. This argument is based on the trial court's alleged failure to make the findings required to impose nine year concurrent sentences for the two counts of rape. Reese contends that the record does not justify imposition of more than the minimum sentence.
 {¶ 29} The possible sentence for a first degree felony under R.C. 2929.14(A)(1) is three to ten years. In sentencing Reese to nine years, the trial court found that the shortest term authorized for the offense "will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others." R.C. 2929.14(B). InState v. Purkhiser, Miami App. No. 2005-CA3-4, 2006-Ohio-4014, we noted that:
 {¶ 30} "[t]he Supreme Court of Ohio recently held that parts of Ohio's felony sentencing scheme are unconstitutional, including R.C. 2929.14(B) * * *. State v. Foster,109 Ohio St.3d 1, 2006-Ohio-856, 245 N.E.2d 470, following Apprendi v.New Jersey (2000), 530 U.S. 466, 120 S.Ct. 2348,147 L.Ed.2d 435, and Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, 159 L.Ed.2d 403. The supreme court concluded that non-minimum sentences imposed under R.C. 2929.14(B) are unconstitutional because the statute `require[s] judicial factfinding before imposition of a sentence greater than the maximum term authorized by a jury verdict or admission of the defendant.' * * * Accordingly, the supreme court severed the provisions that it found to be unconstitutional, including R.C. 2929 .14(B). * * * Foster further instructed that all cases pending on direct review in which the unconstitutional sentencing provisions were utilized must be remanded for resentencing. * * * At resentencing, the trial court will have full discretion to impose a prison sentence within the statutory range and is no longer required to make findings or to give its reasons for imposing non-minimum sentences on an offender who has never served a prison term." 2006-Ohio-4014, at ¶ 25 (citations omitted).
 {¶ 31} The State argues that Reese is not entitled to remand under Foster because he failed to argue below that the sentence violated his Sixth Amendment right to a jury trial. We disagree with the State on this point, because we have uniformly held thatFoster applies to cases that were pending on direct review whenFoster was decided. See, e.g., State v. Smith, Greene App. No. 2005-CA-87, 2005-Ohio-3653, at ¶ 6; State v. Thomas,
Champaign App. No. 2005-CA-35, 2006-Ohio-3859, at ¶ 8; and Statev. Davis, Montgomery App. No. 21047, 2006-Ohio-4005, at ¶ 7-8. This is true even where the argument was not made in the trial court. Davis, 2006-Ohio-4005, at ¶ 7.
 {¶ 32} In the present case, the notice of appeal was filed on September 7, 2005, and Foster was decided on February 27, 2006. Consequently, the error was not waived, and Reese is entitled to have the sentence reversed and remanded under Foster. Id.
 {¶ 33} In light of the above discussion, the second assignment of error is sustained. Accordingly, the sentence is reversed and vacated, and this matter is remanded for re-sentencing within the applicable range in R.C. 2929.14(A)(1). In all other respects, the judgment of the trial court is affirmed.
Wolff, J., and Valen, J., concur.
(Hon. Anthony Valen, retired from the Twelfth Appellate District, sitting by assignment of the Chief Justice of the Supreme Court of Ohio).