OPINION
{¶ 1} Defendant-Appellant, Shawn C. Gay, appeals from his conviction for felonious *Page 2 
assault in violation of R.C. 2903.11(A)(1). Gay was found guilty by a jury and sentenced to two years imprisonment.
 {¶ 2} On appeal, Gay raises the following five assignments of error:
 {¶ 3} "I. "Appellant was deprived of due process and a fair trial through prosecutorial misconduct."
 {¶ 4} "II. "Appellant was deprived of his constitutional right to effective assistance of counsel as guaranteed to him under the Fourth
and Fourteenth Amendments to the United States Constitution."
 {¶ 5} "III. "The court erred in providing inadequate jury instructions."
 {¶ 6} "IV. "Appellant's conviction was against the manifest weight of the evidence."
 {¶ 7} "V. "The cumulative effect of the errors occurring at trial deprived Appellant of a fair trial."
 {¶ 8} We find that the record contains evidence sufficient to support Gay's conviction. Furthermore, we conclude that Gay has failed to demonstrate that the prosecutor's conduct prejudicially affected his right to a fair trial or that trial counsel's actions constituted ineffective assistance of counsel. We also conclude that the trial court did not err in instructing the jury or that the cumulative effect of the alleged errors warrants a reversal. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 9} Gay's fourth assignment of error is taken out of order to facilitate our determination of the issues presented in this appeal. In his fourth assignment of error, Gay contends that his conviction for felonious assault was against the manifest weight of the *Page 3 
evidence.
 {¶ 10} When a conviction is challenged on appeal as being against the manifest weight of the evidence, an appellate court "must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact 'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " State v. Adrian,168 Ohio App.3d 300, 2006-Ohio-4143, 859 N.E.2d 1007, at ¶ 6, quoting State v.Thompkins (1997), 78 Ohio St.3d 380, 387, 678 N.E.2d 541. Essentially, a reviewing court "sits as a 'thirteenth juror' and makes its own independent review of the evidence and inferences derived therefrom, and assesses and weighs the credibility of each witness's testimony." Hagel, Ohio's Criminal Practice and Procedure (2006-07) 796, Section 41.207. However, "[b]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness. Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." State v.Lawson (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684, at *4. Only in exceptional circumstances should a judgment be reversed as being against the manifest weight of the evidence. State v. Parker, Montgomery App. No. 18926, 2002-Ohio-3920, atf70 (citation omitted). *Page 4 
 {¶ 11} In the present case, Gay challenges the testimonies of the State's witnesses as being unreliable due to the influence of their drug habits. Specifically, Gay argues that the victim, Jeffrey Mays, had been high on crack cocaine at the time the alleged assault took place, and that his conduct following the altercation did not comport with the behavior of an assault victim. Furthermore, Gay asserts that drugs influenced the testimonies of witnesses Ashley Deatherage, who was under the influence of crack at the time of the incident but hid in the kitchen when the fighting began, and Donna Dixon, who had gone with Mays to buy crack prior to the incident but left the scene just as an argument between Mays, Gay and defense witness, Raphael Ojezua, commenced. After reviewing the record, we find that Gay's arguments lack merit.
 {¶ 12} At trial, Jeffrey Mays testified that he was staying at the house of Gay and his girlfriend on Hawker Street in Dayton when the incident occurred on or around August 25, 2005. He stated that he, Ashley Deatherage, Donna Dixon and an unnamed woman with a van were at the house on that date. Mays, Dixon and the woman with the van went to buy crack because Mays had run out. Mays testified that he used thirty dollars of the money he earned from selling crack for Gay to buy the drugs. Ms. Dixon also testified that Mays "messed up some money" belonging to Gay or Raphael Ojezua, but she could not testify to a certainty whose money it was. Mays testified that Gay, Raphael Ojezua and Victor Ojezua arrived soon after they returned to the house. Ms. Dixon testified to the same; however, she also stated that she left as soon as an argument between Mays and Gay began. Mays further provided that the three men attacked him because he had spent Gay's money on a competitor's crack. According to Mays, Gay used his fists and a weight bar to beat him about the head and the ribs. Although he attempted to cover his head and eyes, Mays testified that *Page 5 
he was able to see what was happening mostly because breathing problems associated with a broken rib and punctured lung prevented him from protecting himself.
 {¶ 13} Ashley Deatherage testified on direct examination that she didn't see any of the altercation because she was hiding in a corner in the kitchen. However, the State impeached Ms. Deatherage's testimony with a prior statement from a letter she wrote to Mays while he was in jail. In the letter, Ms. Deatherage writes, "It hurt me so bad to watch him hit you." (Tr. at 87.) When asked a second time whether she had witnessed the fight, and more specifically, whether she had seen Gay strike Mays, Ms. Deatherage testified that she had.
 {¶ 14} Mays' testimony also indicated that he was able to push himself out the door of the house, and that he stopped on Clover Street because he couldn't breathe. He stated that he tried to get the attention of a police cruiser passing by, but his injuries again prevented him from raising his arms. Furthermore, Mays testified that he went to a friend's place and had his friend call his sister, Pamela Knolton. He stated that he told Ms. Knolton he needed to go the emergency room because he couldn't breathe.
 {¶ 15} Ms. Knolton testified that when she and her husband picked Mays up on Clover Street, his mouth and nose were bleeding, his chest was swelling up and he could not breathe. Ms. Knolton stated that they took Mays to a hospital, where he was admitted and remained for four days. Dr. Paul Vesco, Mays' attending physician the night he arrived at the hospital, testified that Mays had suffered severe blunt assault injuries-nasal bone fractures, a broken leg, numerous rib fractures, a collapsed lung, a contusion on his right lung, and a large amount of blood in his urine. Mays was also anemic, according to Dr. Vesco, possibly as a result of blood loss from his injuries. Dr. Vesco also provided that narcotics were found in Mays' system. *Page 6 
 {¶ 16} In addition, Mays testified that he waited until September 21, 2005, to report the incident to the police because he was unable to get to the Safety Building, as instructed, to file charges. He also stated that he initially did not plan to prosecute because he thought of Gay as family. However, Mays did testify that pressure from his own family eventually influenced his decision to implicate Gay.
 {¶ 17} Mays testified that he spent time recuperating in Atlanta, Georgia from October, 2005 to February, 2006. Mays stated that he met Gay on Xenia Avenue in Dayton upon his return, and that he voluntarily went home with Gay. He stayed with Gay for several days. Mays testified that he was supplied with crack by Gay and Raphael Ojezua while staying with Gay. On February 7, 2006, Mays went to the Prosecutor's Office in Montgomery County to drop the charges against Gay. According to Mays, Gay told him that "he didn't mean to do what he did," and that he would offer him something, presumably money, if Mays decided not to pursue the charges. (Tr. at 72.) Mays further stated that he was under the influence of crack on that day, and that Gay transported him to the office; however, he also provided that he was not under any physical threat to go. Officer Douglas Baker testified that Mays appeared disorganized and tired on February 7. He also testified that Mays' eyes were red and his lip had a burn that indicated crack usage. Due to a warrant for Mays' arrest, no agreement was signed.
 {¶ 18} In opposition to the State's evidence, the defense offered the testimony of Gay, Raphael Ojezua and Kendra Graves. Both Gay and Ms. Graves testified that a fight between Raphael Ojezua, Victor Ojezua and May was already in progress when they arrived at the house on Hawker Street. According to Gay, he had gone to a Family Dollar store with the Ojezua brothers to buy items for packing. He dropped them off at the house on Hawker *Page 7 
Street but returned later to pick up more of his belongings. At that time, Gay testified that he walked in on the fight. He stated that he pulled Victor Ojezua off of Mays in the midst of the three men struggling, and eventually, he pushed all three out of the house. Gay testified that Ms. Deatherage was in the kitchen when he walked in, but Ms. Dixon was nowhere to be seen.
 {¶ 19} Regarding the weeks Mays spent with Gay after Mays' return from Atlanta, Georgia, Gay testified that there was no animosity between the two men, that Mays was free to come and go as he pleased, and that he had not threatened or tried to intimidate Mays in any way to drop the charges against him.
 {¶ 20} The other defense witness, Raphael Ojezua, testified that he initiated the fight with Mays because he believed Mays had stolen money from him to buy drugs. According to Mr. Ojezua, he had hidden $100 in cash under a hat in the living room of the house where he and Mays were staying. Mr. Ojezua testified that he discovered Mays and Ms. Deatherage smoking crack when he returned from the Family Dollar store and immediately assumed that they had stolen his money to buy the drugs. Mr. Ojezua stated that he confronted Mays, but Mays denied taking the money. Consequently, a fight ensued. Mr. Ojezua testified that he threw the first punch, and that his brother, Victor, also joined in and began to punch and kick Mays. Furthermore, Mr. Ojezua testified that the fight ended when Gay intervened and pulled him and Victor off of Mays. He also stated that he did not see Gay hit or kick Mays at any point. As a result of the altercation, Mr. Ojezua suffered a swollen eye, a bloody lip and some soreness.
 {¶ 21} The State pointed out that on several occasions, a detective attempted to contact Mr Ojezua regarding the incident. Mr. Ojezua testified, however, that he never *Page 8 
responded.
 {¶ 22} Having reviewed the evidence in its totality, we cannot say that the jury clearly lost its way and committed a manifest miscarriage of justice. As we stated previously, substantial deference is given to the factfinder to determine the credibility of each witness. The fact that Jeffrey Mays is a crack addict or that he waited nearly a month to contact the police does not persuade us to doubt his ability to identify his aggressor. Likewise, these facts do not convince us that the jury improperly extended credibility to Mays' testimony. This court has stated that " 'the jury [is] in the best position to weigh the evidence, and [is] free to believe all, some or none of the victim's testimony.' "State v. Reese, Montgomery App. No. 21258, 2006-Ohio-4404, at ]}25 (citations omitted). Furthermore, Gay had much to gain by shifting the guilt for this offense away from himself, as he was already on probation at the time of the trial for possession of cocaine. And, although Raphael Ojezua's testimony exposed him to possible criminal charges, it is not unreasonable to infer that a relationship between these two men existed that was based on loyalty and reciprocity. Given the pervasiveness of drugs in the events surrounding the alleged assault and in the conviction of the defendant, we do not find it unreasonable for the jury to find the testimonies of the State's witnesses more credible than the testimonies offered by the defense. Gay's conviction was not against the manifest weight of the evidence. Accordingly, Gay's fourth assignment of error is overruled.
 II {¶ 23} In his first assignment of error, Gay claims that the conduct of the prosecutor deprived him of a fair trial. On this point, Gay specifically argues that the prosecutor (1) falsely characterized him as the "meanest guy in charge," implying that Gay had control over *Page 9 
the testimonies of the witnesses; (2) inappropriately appealed to the jury's desire to eliminate the drug problem in its community; (3) intentionally implied that defense counsel cooperated in getting Mays high on crack before sending him to sign a non-prosecution agreement; and (4) improperly shaped testimony by asking leading questions.
 {¶ 24} The test regarding prosecutorial misconduct is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones (2000),90 Ohio St.3d 403, 420, 739 N.E.2d 300 (citation omitted). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.' " Id., quoting Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,71 L.Ed.2d 78. When an appellate court reviews allegations of prosecutorial misconduct, it reviews the alleged misconduct in the context of the entire trial. State v. Moore, 163 Ohio App.3d 23,2005-Ohio-4531, 836 N.E.2d 18, at ]}22 (citation omitted). A defendant's conviction will not be reversed when it is clear beyond a reasonable doubt that the jury would have found the defendant guilty even absent the prosecutor's comments. State v. Smith (1984), 14 Ohio St.3d 13, 15,470 N.E.2d 883.
 {¶ 25} Furthermore, failure to object to the alleged wrongful conduct waives all but plain error for the purposes of appellate review.State v. Gardner, Montgomery App. No. 21357, 2007-Ohio-182, at]}46 (citation omitted). In order to find plain error, the reviewing court must find that " 'but for the error, the outcome of the trial clearly would have been otherwise.' " Moore, 2005-Ohio-4531 at ?71, quotingState v. Ballew (1996), 76 Ohio St.3d 244, 251, 667 N.E.2d 369.
 {¶ 26} Our analysis begins with the claim that the prosecutor's characterization of Gay as the "meanest in guy in charge" influenced how the jury considered the testimony of the State's witnesses. Specifically, Gay cites to the following comments made during the State's *Page 10 
closing argument:
 {¶ 27} "Shawn Gay is not in charge. He may be in charge of Ralph [referring to Raphael Ojezua] and Victor, and even Jeffrey sometime, and Kendra, but he's not in charge of us. He's not in charge of our society. His law does not affect us." (Tr. at 315.);
 {¶ 28} "Ralph came in here and said he did it. * * * Why would he come in here and tell you that? I guess he does what's he's told. Shawn Gay's in charge of him." (Tr. at 316.);
 {¶ 29} "The rule on the street is the meanest guy's in charge. The meanest guy's in charge. Rule by fear. Rule your group by fear. It's an old theory." (Tr. at 332.); and
 {¶ 30} "Why'd [Ms. Deatherage] say that? 'Cause Shawn Gay's sittin' right here. What's she gonna say? His people were in the back of the room. What's she gonna say?" (Tr. at 334.)
 {¶ 31} Preliminarily, we note that no objection was raised by Gay to any of these comments. Thus, our review is limited to whether any error rises to the level of plain error. Here, the prosecutor's attempt to portray Gay as a leader whose influence over those around him is predicated on fear or authority may be a broad inference derived from the evidence, but we do not find it to be unreasonable. "Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. In closing argument, a prosecutor may comment freely on 'what the evidence has shown and what reasonable inferences may be drawn therefrom.' " State v. Howard, Montgomery App. No. 20575,2005-Ohio-3702, at]}37 (citation omitted). The evidence in this case demonstrates that Gay at least assumes some authority over Raphael Ojezua and Jeffrey Mays in allowing them to stay at his place without paying rent. Testimony also indicates that Gay maintains some control over Mays and his drug dependency by supplying Mays with crack cocaine. Furthermore, the prosecutor's *Page 11 
comments regarding Ashley Deatherage's testimony comes directly from Ms. Deatherage, who stated that she was afraid of Gay. Overall, we find these comments within the prosecutor's latitude of reasonable inferences arrived at from all of the evidence.
 {¶ 32} Next, Gay claims it was improper for the prosecutor to rely on the jury's desire to cure community drug problems rather than to convict or acquit Gay on the evidence. Gay cites the following comment as pertinent to this argument:
 {¶ 33} "And why do we? Why do we go through this? Because of violence in our community. This may be a drop in the bucket, but we have to do something about the violence, and this was extremely violent and we have to stop it." (Tr. at 336.)
 {¶ 34} Again, we note that no objection was made. In a criminal prosecution, a prosecutor may not call for the jury to convict in response to a public demand. State v. Hicks (1989), 43 Ohio St.3d 72,76, 538 N.E.2d 1030. However, we must review the prosecutor's argument as a whole to determine whether the defendant has been prejudiced. Id. Here, although the prosecutor's remarks were inappropriate, her entire argument did not center on this appeal to the jury's emotions. The record demonstrates that the majority of the prosecutor's argument focused on establishing Gay's guilt by using the evidence presented. Furthermore, we do not find that this misconduct rises to the level of plain error. The evidence offered at trial substantially supported the jury's decision to convict Gay.
 {¶ 35} Gay's third claim of prosecutorial misconduct is based on comments alluding to a plan between defense counsel and Gay to get Mays high on crack before sending him to sign a non-prosecution agreement. We note that Gay objected to the prosecutor's remarks on this matter during direct examination of Mays. The trial court sustained the objection, striking Mays' answer from the record and ordering the jury to disregard it. The jury is *Page 12 
presumed to have followed the court's instructions. State v. Raglin
(1998), 83 Ohio St.3d 253, 264, 699 N.E.2d 482. However, no objection was made to the following comment made during the prosecutor's closing argument:
 {¶ 36} " * * * And then [Gay] burnt him up with crack. Yes, Jeffrey took it. Just tryin' to survive. Just tryin' to not get killed.
 {¶ 37} "And then the Defense sent him to drop charges. There was a plan. He was a mess. He was cracked out. Go down and drop charges." (Tr. at 333.)
 {¶ 38} This court has provided that the prosecution's wide latitude to argue the relative strengths of its case and the relative weakness of the defense "does not extend as far as allowing the prosecution to denigrate the role of defense counsel." State v. Thompson,161 Ohio App.3d 334, 2005-Ohio-2508, 830 N.E.2d 394, at ]}33 (citation omitted). Here, the prosecutor's comment is obviously intended to misguide the jury by insinuating that defense counsel condoned and participated in a plan to defraud the court. With no evidence to support this accusation, the prosecutor clearly denigrated defense counsel's role as a servant of the law. While we find the prosecutor's remarks to constitute misconduct, we must review the conduct in the context of the entire trial. See Moore, 2005-Ohio-4531 at ]}22. Based on the record before us, this isolated statement did not deprive Gay of a fair trial.
 {¶ 39} Gay also argues that the prosecutor improperly led witnesses on direct examination. He specifically directs our attention to the questioning of Donna Dixon, in which the prosecutor asked her the following questions:
 {¶ 40} "Who was yelling the most?" (Tr. at 126.)
 {¶ 41} " * * * what was [Gay] yelling at [Mays] about?" (Tr. at 128.)
 {¶ 42} Gay claims that these questions were based on evidence not properly before the *Page 13 
court. Our review of the record, however, reveals that these questions stem from Ms. Dixon's prior testimony concerning the same subject matter. For example, the record reveals that Dixon testified that "everyone was upset" when they returned, and that Gay was arguing with Mays. (Tr. at 126, 128.) Therefore, we are not persuaded that Gay was denied a fair trial because of any leading questions asked by the prosecutor.
 {¶ 43} Gay's final claims of prosecutorial misconduct involve a question in which the prosecutor refers to Gay as "freeloading," and a question as to whether Gay was the father of Kendra Graves' children (Tr. at 201-02). While the prosecutor's choice of words may be less than desirable, we are not prepared to hold that these questions were so prejudicial as to deny Gay a fair trial. At most, their relevancy is at issue.
 {¶ 44} In conclusion, our review of the record does not support Gay's contention of prosecutorial misconduct. Accordingly, the first assignment of error is overruled.
 III {¶ 45} Gay contends in his second assignment of error that he was deprived his constitutional right to effective assistance of counsel when his attorney failed to object to the allegedly improper remarks made by the prosecutor, as well as the jury instructions concerning Gay's "other acts" and the authority of the jury foreperson.
 {¶ 46} A claim of ineffective assistance of counsel is reviewed under the two-part test provided in Strickland v. Washington (1984),466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. To prevail on a claim of ineffective assistance of counsel, "a defendant must show that counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different." State v. Stevens, *Page 14 
Montgomery App. No. 19572, 2003-Ohio-6249, at ?33. Moreover, a claim of ineffective assistance of counsel cannot be predicated upon a matter which did not constitute error. State v. Woullard, 158 Ohio App.3d 31,2004-Ohio-3395, 813 N.E.2d 964, at ]}44 (citation omitted).
 {¶ 47} Here, Gay has not satisfied the Strickland standard. As noted above, we find that the prosecutor's conduct did not meet the level of plain error so as to deny Gay a fair trial. Therefore, Gay cannot predicate his claim of ineffective assistance of counsel on failure to object to the prosecutor's allegedly prejudicial remarks.
 {¶ 48} Additionally, we do not find error with regard to the jury instructions. Accordingly, we cannot say that defense counsel was ineffective in failing to object to these instructions.
 {¶ 49} Gay's second assignment of error is overruled.
 IV {¶ 50} Gay's third assignment of error states that the trial court erred in providing inadequate jury instructions. According to Gay, the trial court's instructions failed to preclude the jury from considering his felony record. In addition, Gay claims the jury instructions improperly described the jury foreperson as having no greater "duty," as opposed to "authority," than the other jurors.
 {¶ 51} It is well-established that " 'the jury instructions given by a trial court must be a correct, clear, and complete statement of the law applicable to the case.' " State v. Thomas, Greene App. No. 05-CA-128,2007-Ohio-1344, at]}15 (citation omitted). However, a party on appeal " 'may not assign as error the giving or failure to give any instructions unless the party *Page 15 
objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection.' " Id., citing Crim. R. 30(A). "The failure to object to a jury instruction constitutes waiver of any claim of error relative thereto, unless, but for the error, the outcome of the trial clearly would have been otherwise." State v. Cunningham (1990), 67 Ohio App.3d 366, 368,587 N.E.2d 310.
 {¶ 52} We begin by noting that no objection was made to the following jury instructions at issue:
 {¶ 53} "The evidence you heard regarding Mr. Gay's involvement in drug transactions was presented because it is part, at least from the State's perspective, of the context of the occurrence involving Mr. Mays. Mr. Gay is not charged with any drug crime and any involvement by Mr. Gay in drug sales is not, standing alone, evidence that Mr. Gay is Guilty of Felonious Assault." (Tr. at 345.), and
 {¶ 54} "One of the first things you do — you should do when you go back to the Jury Room is to select a Foreperson. That Foreperson will have no greater duty than any one else other than to — to preside over the discussions, to keep the discussions orderly, and to al-and to allow each Juror to have a say and to voice an opinion regarding the evidence. Other than that, of course, the Foreperson has no greater or less duty than any other Juror." (Tr. at 349.)
 {¶ 55} Here, Gay has failed to describe how the outcome of trial would clearly have been different had the jury been instructed in the manner he believed appropriate. According to Gay, the first instruction was prejudicial in light of the prosecutor's comments that he was the meanest person in charge. Having found these remarks not to constitute plain error, we do not believe that this instruction prejudicially affected Gay's rights to a fair trial. Moreover, *Page 16 
we do not find merit in Gay's argument that replacing the word "duty" in the instruction above with the word "authority" would have changed the outcome of the trial by allowing the jury to arrive at a just verdict. We find that the instruction as written serves its purpose of informing the jurors that a foreperson's role is simply to maintain order, not to persuade jurors to vote one way or another. Thus, the third assignment of error is overruled.
 V {¶ 56} In his fifth and final assignment of error, Gay claims that the cumulative effect of the alleged errors he has raised warrants a reversal of his conviction. In support of his argument, he citesState v. DeMarco (1987), 31 Ohio St.3d 191, 509 N.E.2d 1256.
 {¶ 57} From our review of the record, we have found only one claimed error having possible merit — the prosecutor's comments denigrating defense counsel's role. However,
 {¶ 58} we concluded that this error was not sufficiently prejudicial to warrant reversal. Having found no other errors to cumulate with this error, Gay's reliance on DeMarco is ill-founded. Thus, Gay's fifth assignment of error is overruled.
 {¶ 59} Having overruled all of Gay's assignments of error, the judgment of the trial court is affirmed.
WOLFF, P.J., concurs.